UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- X

DWAYNE E. SCOTT,

                    Plaintiff,                    **NOT FOR PUBLICATION**

     -against-                                    <u>**MEMORANDUM & ORDER**</u>

MICHAEL J. ASTRUE,                                09-CV-3999
Commissioner of Social Security,                  (KAM) (RLM)


                    Defendant.

---------------------------------------- X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. § 405(g),[1] plaintiff, Dwayne E.

Scott ("plaintiff"), appeals the final decision of defendant,

Michael Astrue, Commissioner of Social Security ("defendant"),

who denied plaintiff's application for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act.

Proceeding *pro se*, plaintiff contends that he is entitled to

receive SSI benefits due to severe medically determinable

impairments, which he alleges render him disabled and prevent him

from performing any work.  Presently before the court is

defendant's motion for judgment on the pleadings.  For the

reasons below, defendant's motion is denied and the case is

remanded for further proceedings consistent with this opinion.

---

[1]    Individuals may seek judicial review in the United States district court
for the judicial district in which they reside over any final decision of the
Commissioner rendered after a hearing to which they were a party, within sixty
days after notice of such decision or within such further time as the
Commissioner may allow.  <u>See</u> 42 U.S.C.A. § 405(g).

## I.    BACKGROUND

### A. Procedural History

Plaintiff applied for SSI benefits on February 11, 2008, alleging disability beginning on January 25, 2008. (Tr. 53-58, 62.)[2] Plaintiff contended that he was disabled due to gout,[3] congestive heart failure,[4] diabetes, high blood pressure, and arthritis in both knees. (Tr. 67.) The Social Security Administration ("SSA") denied the claim on March 18, 2008. (Tr. 27, 28-33; see Tr. 185-91.) After his claim was denied, plaintiff requested and obtained a hearing before an Administrative Law Judge ("ALJ"), which was held on November 24, 2008. (Tr. 17.) Although informed of his right to an attorney, plaintiff chose to proceed without counsel. (See Tr. 15-17.)

On December 8, 2008, ALJ Newton Greenberg issued a decision denying plaintiff's SSI application, finding that, based on the entire record, plaintiff was not disabled as defined in the Act during the period following plaintiff's alleged disability onset date of January 25, 2008. (Tr. 13.)

---

[2]    The abbreviation "Tr." refers to the administrative record (1-207).

[3]    Gout is a disorder occurring especially in men "characterized by a raised but variable blood uric acid level and severe recurrent acute arthritis of sudden onset." Stedman's Medical Dictionary 168070(27th Ed. 2000) ("Stedman's").

[4]    Congestive heart failure or "heart failure" is the inadequacy of the heart's pump to maintain the circulation of blood, with the result that congestion and edema develop in the tissues. See Stedman's at 145050. Resulting clinical symptoms include shortness of breath or nonpitting edema, enlarged tender liver, engorged neck veins, and pulmonary rales in various combinations. Id.

Specifically, the ALJ held that the claimant had the residual functional capacity ("RFC")[5] to perform the full range of "sedentary work" as defined in 20 C.F.R. § 416.967(a).[6] (See Tr. 11.) The ALJ further noted, under 20 C.F.R. § 416.969(a),[7] that considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform. (Tr. 13.)

On August 12, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security ("the Commissioner"). (Tr. 1-3.) This appeal followed.

Proceeding *pro se*, plaintiff filed this complaint on September 9, 2009. (See Doc. No. 1, Complaint dated 9/9/2009 ("Pl. Compl.").) In his complaint, plaintiff alleges that the ALJ's decision failed to award proper weight to the opinion of Dr. Jamsheed Abadi, plaintiff's primary care physician "of two years." Id. Specifically, plaintiff alleges that the ALJ failed to properly consider Dr. Abadi's assessment that plaintiff was

---

[5]    "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from physical and mental impairments.  20 C.F.R. § 416.945(a).

[6]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 416.967(a).

[7]    "If you cannot do your past relevant work, [the SSA] will use the same [RFC] assessment along with your age, education, and work experience to decide if you can adjust to any other work which exists in the national economy."  20

both temporarily unemployable and unemployable for at least twelve months.  See id.  The government filed a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). (See Doc. No. 12, Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.").)

## B. Non-Medical Facts in the Administrative Record

Plaintiff[8] was born on May 21, 1963.  (Tr. 53.)  He obtained a GED in 1989.  (Tr. 73.)  Plaintiff was incarcerated for periods between 1989 and 1991, 1996 and 2001, and March 2006 to May 2007. (Tr. 23, 73.)  During part of his incarceration, plaintiff learned the trade of carpet cleaning and welding.  (Tr. 25.)

Plaintiff has worked at various jobs beginning in 1978 up until 2004.  (Tr. 75.)  Between 1978 and 1999, plaintiff worked sporadically as a laborer in the construction, plumbing and restaurant businesses and carried out various "odd jobs."[9] (Tr. 25, 75.)  Between 2002 and 2004, plaintiff worked as a messenger for Wildcat Service Corporation ("Wildcat"),[10] where he

---

C.F.R. § 416.969(a).

[8]    Although plaintiff's given name is Dwayne E. Scott, between 2003 and 2005, plaintiff used the alias "Edward Lemons" after his release from jail; however, plaintiff retained the same social security number and date of birth. (Tr. 73.)

[9]    According to plaintiff's SSI application, he carried out unspecified "odd jobs" between 1978 and 1982.  (Tr. 68.)  Plaintiff worked as a laborer during 1985, between 1990 and 1991, between 1994 and 1995, and during 1999. Id.  This suggests that the plaintiff was unemployed between 1982 and 1985, between 1991 and 1994, and between 1996 and 2002.  (See Tr. 68.)

[10]    Wildcat Service Corporation is a United States organization that

delivered, lifted, and carried packages from "one place to another [for eight] hours a day." (Tr. 80-81.) Plaintiff testified that he stopped working as a messenger because the company terminated him in 2004 due to the recession. (Tr. 22.)

In his initial SSI benefits application, plaintiff alleged that he stopped working in May 2004 after his termination from Wildcat. (Tr. 67.) However, at the hearing before the ALJ on November 24, 2008 (Tr. 17.), plaintiff testified that he temporarily worked "off the books" making baby clothing on an assembly line at a factory for approximately two months in 2006 after his release from jail. (Tr. 24.) Plaintiff reported that during this job, he suffered difficulties stemming from stiffness in his legs. See id.

At the time of his SSI application in early 2008, plaintiff lived in an inpatient drug treatment facility known as Samaritan Village, which housed 155 patients. (Tr. 54, 88.) During his residence at Samaritan Village, plaintiff's assigned job function consisted of ensuring that the facility's bathrooms had necessary supplies and that patients had necessary personal items for each week. (Tr. 89.) On a typical day, plaintiff woke up, ate breakfast, attended a "house meeting," received his medication, carried out his job function with two other patients,

---

provides transitional work for unemployed individuals with criminal convictions. See Wildcat Service Corporation, http://www.wildcatnyc.org/about.php (last visited July 9, 2010).

and attended group seminars throughout the day.  Id.

At Samaritan Village, plaintiff did not cook, perform any extensive house chores, or carry out yard work because such tasks were assigned to other patients by the facility's staff. (Tr. 90-91.) However, plaintiff sometimes carried out household chores such as sweeping and light mopping.  (Tr. 91.)  Although at the time of his SSI application, plaintiff was not yet allowed to leave the facility unescorted, he sometimes left the facility during doctor appointments or group trips.  Id.  Plaintiff's application stated that he could no longer play sports, run, jump, or swim as a result of his claimed disabilities.  (Tr. 92.) Instead, plaintiff stated that in his free time he read and watched television.  Id.

As of January 2008 and continuing through the time of his hearing before the ALJ, plaintiff has been on Public Assistance.  (Tr. 11, 54.)

**C. Medical Facts in the Administrative Record**

1. Evidence Prior to Disability Onset Date (Jan. 25, 2008)

On December 4, 2003 at New York Methodist Hospital, plaintiff underwent a transesophageal echocardiography,[11] which showed the following:  normal left ventricular systolic

---

[11]    An "echocardiography" is "the use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions." Stedman's at 123520.  A "transesophageal echocardiography" is a "recording of the echocardiogram from a transducer swallowed by the patient to predetermined distances in the esophagus and stomach." Id.

function,[12] elevated right ventricular systolic pressure,
moderate concentric left ventricular hypertrophy,[13] a mildly
dilated right ventricle and right atrium, a moderately dilated
left atrium, thrombus[14] in the left atrial appendage,[15] mild to
moderate mitral regurgitation,[16] mild to moderate tricuspid
regurgitation,[17] fibrocalcific[18] aortic sclerosis,[19] small
pericardial effusion,[20] and no indications of cardiac tamponade.[21]

---

[12]    A "ventricular systole" is a "contraction of the ventricles" by which
"blood is driven through the aorta and pulmonary artery to traverse the
systemic and pulmonary circulations." See Stedman's at 398290. An evaluation
of a patient's systolic function is an evaluation of the "special action or
physiological property of an organ or other part of the body." See id. at
155860.

[13]    "Hypertrophy" is the "general increase in bulk of a part or organ, not
due to tumor formation." Stedman's at 193780.

[14]    "Thrombus" is "a clot in the cardiovascular systems formed during life
from constituents of blood; it may be occlusive or attached to the vessel or
heart wall without obstructing the lumen." Stedman's at 409190.

[15]    The left atrial appendage or "left auricle" is "the small conical
projection from the left atrium of the heart." Stedman's. at 37990.

[16]    A "mitral regurgitation" is a "reflux of blood through an incompetent
mitral valve." Stedman's at 351800. A "mitral valve" is "the valve closing
the orifice between the left atrium and left ventricle of the heart." See id.
at 43191020.

[17]    A "tricuspid regurgitation" is a backward flow of blood through a
tricuspid valve. See Stedman's at 351800. The "tricuspid valve" is the
"valve closing the orifice between the right atrium and right ventricle of the
heart." See id. at 431020.

[18]    "Fibrocalcific" is "pertaining to or characterized by partially
calcified fibrous tissue." Dorland's Medical Dictionary (Elsevier 2007),
available at
http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split.jsp?pg=/ppdocs/us/c
ommon/dorlands/dorland/misc/dmd-a-b-000.htm (last visited July 9, 2010)
("Dorland's").

[19]    Aortic sclerosis is the hardening or induration of the aorta.
Dorland's.

[20]    A "pericardial effusion" refers to "increased fluid within the
pericardial sac" which may "cause circulatory compromise by compression of the
heart" and is "most often caused by inflammation, infection, malignancy, and
uremia." See Stedman's at 125240. The pericardial sac or the "pericardium"

*Dr. Gelles's 2005 Report on Plaintiff's Physical Condition*

In July 2005, plaintiff was hospitalized in New York Methodist Hospital due to congestive heart failure and was discharged on July 19, 2005. (Tr. 116.) Dr. Jeremiah M. Gelles, plaintiff's treating physician during his hospitalization, reported that plaintiff's diagnoses were chronic renal insufficiency,[22] anemia,[23] dyslipidemia,[24] atrial fibrillation,[25] congestive heart disease, hypertensive[26] cardiovascular disease, and arthritis in his knees. (Tr. 116.) Dr. Gelles also noted that plaintiff had no history of diagnosed mental illness, no history of physical or sexual abuse, and no history of suicidal or homicidal thoughts. (Tr. 118.) As a result of plaintiff's heart failure, Dr. Gelles stated that plaintiff could no longer sustain gainful employment and "should be placed on disability." (Tr. 116.)

---

is the "fibroserous membrane . . . covering the heart and beginning of the great vessels." Id. at 304970.

[21]    "Cardiac tamponade" is the "compression of the heart due to critically increased volume of fluid in the pericardium." Stedman's at 399510.

[22]    Renal insufficiency is the defective function of the kidneys, with accumulation of waste products in the blood. Stedman's at 205100.

[23]    Anemia is in which the number of red blood cells per mm is less than normal. Stedman's at 21460.

[24]    Dyslipidemia is abnormality in, or abnormal amounts of, lipids or lipoproteins in the blood. Dorland's.

[25]    Atrial fibrillation is fibrillation in which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall. See Stedman's at 148120.

[26]    Hypertensive describes cardiovascular disease marked by increased blood pressure. Stedman's at 193520.

*Dr. Valery's 2006 Report on Plaintiff's Physical Condition*

On January 6, 2006, plaintiff returned to New York Methodist Hospital, complaining of shortness of breath during the prior week. (Tr. 141; see Tr. 141-153.) According to the report of plaintiff's 2006 primary care physician Dr. Emmanuel Valery, plaintiff demonstrated coughing, orthopnea,[27] leg edema,[28] and dyspnea[29] on exertion and at rest. (Tr. 142.) Dr. Valery's report also noted that plaintiff functioned independently in his activities of daily living, including walking, cooking, feeding himself, personal hygiene, and shopping for food. Id. The report indicated that plaintiff had a twenty-five year history of cocaine drug abuse. (Tr. 143.) Examination of the plaintiff's back, joints, extremities, abdomen, genitalia, rectum, and neurological system showed normal findings. (Tr. 144.) Plaintiff also showed normal motor and sensory functions. (Tr. 147.) Plaintiff displayed abnormal cardiac rhythm according to Dr. Valery's cardiac auscultation,[30] and an electrocardiogram[31]

---

[27]  Orthopnea is discomfort in breathing that is brought on or aggravated by lying flat. Stedman's at 287270.

[28]  Edema is an accumulation of an excessive amount of watery fluid in cells or intercellular tissues resulting in swelling of the affected organ. Stedman's at 124770.

[29]  Dyspnea is shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs. Stedman's at 122310.

[30]  Auscultation is listening to the sounds made by the various body structures as a diagnostic method. Stedman's at 38190.

[31]  An electrocardiogram or "EKG" is a graphic record of the heart's integrated action currents obtained with the electrocardiograph displayed as

showed atrial fibrillation. (Tr. 146-147.)  A chest x-ray displayed cardiomegaly[32] with pulmonary edema.  Based upon these findings, Dr. Valery diagnosed plaintiff with exacerbation of congestive heart failure, secondary to upper respiratory infection.  (Tr. 146.)  Accordingly, plaintiff was treated with intravenous Avelox.[33]  Id.

*Dr. Gowda's 2007 Report on Plaintiff's Condition*

On August 31, 2007, plaintiff visited Dr. Ramesh M. Gowda, a cardiologist at the Bedford Williamsburg Center, for a medical consultation.  (Tr. 131.)  Although Dr. Gowda noted that plaintiff was not in acute distress, Dr. Gowda listed plaintiff's conditions as shortness of breath, atrial fibrillation, congenital heart failure, and arteriosclerotic cardiovascular disease.  (Tr. 132.)  Dr. Gowda's examination displayed negative results for chest pain and heart palpitations and revealed normal vascular system functioning.  (Tr. 131.)  However, plaintiff had abnormal heart sounds,[34] had an irregular heart rhythm, and was diagnosed as obese.  (Tr. 131-32.)  Dr. Gowda noted that plaintiff visited because he wanted "paper work completed for

---

voltage changes over time.  Stedman's at 126240.

[32]    Cardiomegaly is the enlargement of the heart.  Stedman's at 64420.

[33]    Avelox is a prescription antibiotic drug of the generic drug type know as moxifloxacin. See Drugs.com, Avelox Official FDA Information, http://www.drugs.com/pro/avelox.html (last visited July 9, 2010). Moxifloxacin is a broad-spectrum antibiotic effective against many gram-positive and gram-negative bacteria. Dorland's; see also Drugs.com.

[34]    Heart sounds are the noises made by muscle contraction and the closure

disa[b]ility." (Tr. 131.) After consultation, Dr. Gowda ordered an echocardiogram. (Tr. 132.)

On August 31, 2007, the same day as his consultation with Dr. Gowda, plaintiff underwent an echocardiogram in the medical office of Dr. Marian (Mark) David. (Tr. 125.) According to the echocardiogram, plaintiff showed good systolic function, a mildly dilated left atrium, mild mitral regurgitation, mild aortic insufficiency, mild pulmonary insufficiency,[35] and mild tricuspid regurgitation. Id.

Subsequent to the echocardiogram, Dr. Gowda completed a wellness report on November 6, 2007. (Tr. 122-23.) In the report, Dr. Gowda diagnosed plaintiff with obesity, chronic atrial fibrillation, and hypertension.[36] (Tr. 122.) Dr. Gowda listed plaintiff's medications as including Metoprolol,[37] Enalapril,[38] Warfarin,[39] Lasix,[40] and Procardia.[41] Dr. Gowda

_____

of the heart valves during the cardiac cycle. Stedman's at 377780.

[35] Aortic insufficiency and pulmonary insufficiency are both types of valvular regurgitation. See Stedman's at 205100. Valvular regurgitation is the leaky state of one or more of the cardiac valves where the valve does not close tightly allowing blood to regurgitate through it. Id. at 351800.

[36] "Hypertension" refers to "high blood pressure which is elevated to a level likely to induce cardiovascular damage or other adverse consequences." See Stedman's at 855.

[37] Metoprolol is a blocking agent, administered orally or intravenously, used in the treatment of hypertension, agina pectoris, and myocardial infraction. Dorland's.

[38] Enalapril is an enzyme inhibitor used in the treatment of hypertension, congestive heart failure, and asymptomatic left ventricular dysfunction. Dorland's.

[39] Warfarin is a synthetic anticoagulant, administered orally or intravenously, to prevent the clotting of blood. Dorland's.

further noted that plaintiff's condition had been resolved or
stabilized and that his cardiac condition appeared to cause no
functional limitations as plaintiff took all required
medications, made lifestyle modifications, and actively followed
up with his treating physicians. (See Tr. 123.)  However, Dr.
Gowda indicated that she would defer to plaintiff's primary care
physician at that time with regard to the designation of
plaintiff's functional limitation for the purposes of
employability. (See Tr. 123.)

*Dr. Spinelli's January 2008 Cardiology Consultation*

On January 10, 2008, plaintiff visited Bronx Lebanon
Hospital Center for an initial cardiology consultation. (Tr.
158.)  Before receiving consultation, plaintiff disclosed his
past medical history and drug use to Dr. Michael Spinelli. (Tr.
158.)  In particular, plaintiff notified Dr. Spinelli that while
incarcerated in 2002, plaintiff had a cardiac catheterization[42]
at New York Methodist Hospital and was told that he had no
blockage.  Id.  Plaintiff also informed Dr. Spinelli about an
attempted but unsuccessful direct-current cardioversion[43] in

---

[40]     Lasix is the trademark name for the prescription drug furosemide, a
diuretic (usually used in the treatment of edema). See Dorland's.

[41]     Procardia is the trademark name for preparations of nifedipine, a
coronary dilator, used in the treatment of hypertension. Dorland's.

[42]     Cardiac catheterization is the passage of a catheter into the heart. See
Stedman's at 67020.  A catheter is a tubular instrument to allow passage of
fluid from or into a body cavity or blood vessel.  Id. at 67010.

[43]     Direct-current cardioversion is the restoration of the heart's rhythm to

2002.  Id.  Plaintiff reported that since that unsuccessful

cardioversion, he maintained his dosage of Coumadin.[44]  Id.

    After briefing the doctor on his medical history,

plaintiff complained of his current health problems including

chronic dyspnea on exertion, fatigue, orthopnea, and bilateral

knee osteoarthritis.[45]  Id.  Plaintiff further stated to Dr.

Spinelli that he gets shortness of breath on exertion after two

blocks on a level surface and after walking for a short time on

an incline.  See id.  Dr. Spinelli noted that plaintiff appeared

to be in no acute distress, showed no lower extremity edema, and

had a blood pressure of 110/80 with a heart rate of 78.  Id.

However, Dr. Spinelli indicated that plaintiff had normal heart

sounds and showed signs of bilateral edema.  Id.

    Based upon this examination, Dr. Spinelli diagnosed

plaintiff with hypertension, heart failure, diabetes, and atrial

fibrillation with signs and symptoms of decompensated[46] heart

failure. (Tr. 159.)  After this diagnosis, Dr. Spinelli ordered

blood work, referred plaintiff for an echocardiogram, and advised

plaintiff to continue visits to the Coumadin clinic.  (Tr. 159.)

---

normal by electrical countershock.  Stedman's at 64890.

[44]    Coumadin is the trademark name for preparations of warfarin sodium, an
anticoagulant. Dorland's.

[45]    Osteoarthritis is arthritis characterized by erosion of articular
cartilage and often results in pain and loss of function mainly in weight-
bearing joints. Stedman's at 288490.

[46]    Decompensation in cardiology refers to a failure of compensation in
heart disease.  Stedman's at 103960.  Compensation refers to the maintenance

Dr. Spinelli withheld further action regarding plaintiff's heart condition until he could review plaintiff's past medical records. (Tr. 159.) Finally, Dr. Spinelli noted that if plaintiff's echocardiogram showed a diminished ejection fraction[47] and progressive symptoms, Dr. Spinelli would favor cardiac catheterization. (Tr. 159.)

2. Evidence After Plaintiff's Claimed Disability Onset Date (Jan. 25, 2008)

*Dr. Spinelli's Analysis of Plaintiff's Echocardiogram*

On February 12, 2008, plaintiff underwent an echocardiogram. (Tr. 162-79.) According to the echocardiogram, plaintiff was in atrial fibrillation, had a mildly dilated left ventricle, moderately dilated left atrium, dilated right atrium, dilated right ventricle with normal function, mild mitral valve regurgitation, mild tricuspid valve regurgitation, mildly elevated pulmonary artery pressure, moderate fluid pericardial effusion present without signs of tamponade, and normal ejection fraction. (Tr. 178.)

After the echocardiogram, plaintiff returned to Dr. Spinelli's clinic on February 14, 2008 for a follow-up visit. (Tr. 156.) Dr. Spinelli noted plaintiff's persistent complaints

---

of an adequate blood flow without distressing symptoms. Dorland's.

[47] Ejection fraction is the fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction; with the onset of congestive heart failure, the ejection fraction decreases. Stedman's at 153950.

of shortness of breath, fatigue, and some orthopnea; however, these symptoms were less severe than during plaintiff's initial visit. Id. Dr. Spinelli noted that plaintiff was not in acute distress, showed a blood pressure of 118/80, and had a regular heart rate and rhythm and normal heart sounds. Id. Upon evaluation of the echocardiogram and plaintiff's symptoms, Dr. Spinelli indicated a concern that his symptoms may be related to ischemia.[48] (Tr. 156.) Dr. Spinelli also noted plaintiff's normal ejection fraction of 67%, controlled blood pressure, and an asymptomatic moderate sized pericardial effusion without evidence of tamponade. Id. Because of plaintiff's persistent symptoms including edema, Dr. Spinelli recommended a nuclear stress test to rule out significant coronary disease and advised plaintiff to continue to follow up with the Coumadin clinic. (Tr. 156-57.)

*Physical Residual Functional Capacity Assessment*

On March 14, 2008, plaintiff received a physical RFC Assessment. (Tr. 185-91.) According to the assessment form, plaintiff's primary diagnoses were cardiomyopathy[49] and diastolic dysfunction, and plaintiff's secondary diagnosis was chronic atrial fibrillation. (Tr. 185.) Plaintiff also alleged diabetes

---

[48]    Ischemia is local anemia due to mechanical obstruction of the blood supply, mainly by arterial narrowing or disruption. Stedman's at 211420.

[49]    Cardiomyopathy is a disease of the myocardium, the middle layer of the heart consisting of the cardiac muscle. See Stedman's at 64460.

and obesity at the time of his assessment.  Id.  The RFC
assessment showed the following exertional limitations:
occasional lifting and/or carrying of ten pounds; frequent
lifting and/or carrying of less than ten pounds; standing and/or
walking with normal breaks for a total of at least two hours in
an eight hour workday; and sitting with normal breaks for a total
of about six hours in an eight hour work day.  (Tr. 186.) The RFC
assessment also showed the following postural capacities and
limitations: frequent balancing, stopping, and kneeling;
occasional climbing up stairs, crawling, and crouching; and an
inability to climb scaffolds and ladders due to shortness of
breath and chest pain.  (Tr. 187.)  However, the RFC assessment
showed no manipulative, visual, or communicative limitations.
(Tr. 188-89.)  The RFC showed minimal environmental limitations
requiring plaintiff to avoid concentrated exposure to extreme hot
and cold temperatures and to machinery hazards due to his chest
pain and shortness of breath.  (Tr. 189.)

*Dr. Hussain's Work Ability Assessment*

On August 29, 2008, plaintiff requested a work ability
assessment from internist Dr. Fazil Hussain.  (Tr. 202-06.)  Dr.
Hussain's medical examination displayed several of plaintiff's
persistent conditions including fatigue, dyspnea on exertion,
orthopnea, edema, hypertension, diabetes, arthritis, and gout.
(Tr. 203.)  Dr. Hussain also noted plaintiff's obesity,

respiratory wheezing, arrhythmia,[50] displaced point of maximal impulse,[51] and edema.  (Tr. 203-04.)  In assessing plaintiff's pain, Dr. Hussain noted that plaintiff suffered from pain in the knees that has the capacity to reach a distressing level of pain. (Tr. 204.)

Because plaintiff's medical conditions were unstable, Dr. Hussain declined to assess plaintiff's functional capacity or employment limitations and instead recommended a sixty-day wellness plan, a cardiologist's evaluation of plaintiff's dyspnea on exertion and congestive heart failure, and an echocardiogram of plaintiff's ejection fraction.  (Tr. 206.)

*Dr. Abadi's Wellness Rehabilitation Plan Report*

On September 11, 2008, plaintiff was admitted to the Brookdale University Hospital and Medical Center due to a large pericardial effusion. (Tr. 198.)  Plaintiff underwent a pericardial window[52] procedure to drain the pericardial fluid out of his heart.  (Tr. 198-99.)

Subsequent to plaintiff's medical procedure, Dr. Abadi,

---

[50]    Arrhythmia refers to the loss or abnormality of rhythm, denoting an irregularity of the heartbeat.  See Stedman's at 32220.

[51]    The point of maximal impulse is the point on the chest where the impulse of the left ventricle is sometimes felt or seen most strongly. Dorland's.

[52]    A pericardial window is a procedure in which an opening is made in the pericardium to drain fluid that has accumulated around the heart; the window is made via a small incision below the end of the breastbone or via a small incision between the ribs on the left side of the chest.  See University of Southern California Keck School of Medicine, Pericardial Window, Medical Glossary, http://www.cts.usc.edu/zglossary-pericardialwindow.html (last visited July 9, 2010).

plaintiff's cardiologist and primary care physician, completed a wellness rehabilitation plan report on October 1, 2008. (Tr. 200-01.) Dr. Abadi diagnosed plaintiff with arthritis, hypertension, atrial fibrillation and pericardial effusion. (Tr. 200.) Dr. Abadi also listed elevated blood pressure, irregular heartbeats, distant heart sounds, limitation of motion of joints, and edema of the lower legs as findings relevant to the physician's wellness report. Id. Dr. Abadi further noted that plaintiff attended all scheduled appointments, took all prescribed medication, and complied with other types of treatment. Id. Dr. Abadi indicated that the condition that was the focus of treatment has been resolved or stabilized. (Tr. 201.) However, with regard to plaintiff's functional capacity, Dr. Abadi indicated that plaintiff was temporarily disabled and was also unable to work for at least twelve months. Id. Dr. Abadi did not specify the timeframe of the patient's unemployability and did not provide any additional comments regarding plaintiff's functional capacity. (Tr. 201.)

*Plaintiff's November 24, 2008 Hearing Testimony*

At the administrative hearing held on November 24, 2008, plaintiff testified that he experienced congestive heart failure earlier that year, which caused him to feel shortness of breath. (Tr. 18-19, 22, 24.) Plaintiff, referring to his pericardial window procedure, indicated that doctors recently

18

drained fluid from around his heart with a tube through a chest incision. (Tr. 17-19.) Plaintiff noted that at the time of the hearing, he was taking blood thinning, heart disease, diabetes, cholesterol, and high blood pressure medications. (Tr. 17, 22, 72.)

Plaintiff also noted that he continued to suffer from diabetes, high blood pressure, and leg arthritis. (Tr. 21.) He told the ALJ that he could not work because of his heart fibrillation and his arthritis. (Tr. 23.) Plaintiff further testified that his arthritis caused stiffness and swelling in his legs, which prevented him from working. (Tr. 24.)

## II. DISCUSSION

### A. Standard of Review

1. <u>The Substantial Evidence Standard</u>

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "'more than a mere scintilla'" and has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). An evaluation of the

"substantiality of evidence must also include that which detracts from its weight." <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).

Accordingly, if there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. <u>See</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999); <u>see also</u> 42 U.S.C. § 405(g). Moreover, the reviewing court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991) (<u>quoting</u> <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)).

2. <u>The ALJ's Affirmative Duty to Develop the Record</u>

Notwithstanding the substantial deference afforded to the ALJ's determination, remand is appropriate where there are gaps in the administrative record or where the ALJ has applied an improper legal standard. <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-83 (2d Cir. 1999). "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." <u>Burgess</u>, 537 F.3d at 128; <u>see</u> <u>Lamay v. Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508-09 (2d Cir. 2009) ("[S]ocial security hearings are not (or at least are not meant to be) adversarial in nature.").

Remand may be required where the ALJ fails to discharge his or her affirmative obligation to develop the record when making a disability determination. See Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2009); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that in deciding whether the Commissioner's findings are supported by substantial evidence, courts must first ensure that claimant is afforded a full and fair hearing and a fully developed record). Indeed, when a claimant proceeds *pro se*, the ALJ has a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (citing Echevarria, 685 F.2d at 755).

**B. Legal Standards for Disability Claims**

1. The Commissioner's Five-Step Analysis of Disability Claims

A claimant is disabled within the meaning of the Social Security Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis requiring the ALJ to make a finding of disability if he or she determines: "(1) that the claimant is not working,[53] (2) that he [or she] has a 'severe impairment,'[54] (3) that the impairment is not one that is [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[55] . . . (4) that the claimant is not capable of continuing in his [or her] prior type of work,[56] . . . [and] (5) there is not another type of work that claimant can do."[57]  Burgess, 537 F.3d at 120 (internal citations omitted); see also 20 C.F.R. § 404.1520(a)(4).

The claimant must prove his case at steps one through four; thus, the claimant bears the "general burden of proving . . . disability."  Burgess, 537 F.3d at 128.  At the fifth step, the

---

[53]    Under the first step, if the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings.  20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[54]    Under the second step, the claimant must have "any impairment or combination of impairments which significantly limit [his or her] physical or mental ability to do basic work activities" in order to have a severe impairment.  20 C.F.R. § 404.1520(c).

[55]    Under the third step, if the claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is per se disabled.  20 C.F.R. § 404.1520(d).

[56]    Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).

[57]    Under the fifth step, the claimant may still be considered not disabled if he or she "can make an adjustment to other work" available in the national economy.  See 20 C.F.R. 404.1520(a)(4)(v).

burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RFC, age, education and work experience he or she is "able to engage in gainful employment within the national economy." Sobolewski v. Apfel, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). In making that determination, the Commissioner need not provide additional evidence about the claimant's RFC, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his past relevant work. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also 20 C.F.R. § 404.1560(c)(2).

## 2. The Treating Physician Rule and the Commissioner's Duty To Give "Good Reasons" For the Weight Given to Physicians' Opinions

Under the Commissioner's regulations, the medical opinion of a treating source "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Burgess, 537 F.3d at 128 (citing Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." Green-Younger, 335 F.3d at 107. According to the regulations,

the opinions of treating physicians deserve controlling weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In light of the ALJ's affirmative duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  Rosa, 168 F.3d at 79; see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte."); Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").  Moreover, before an ALJ can reject an opinion of a pro se claimant's treating physician because the opinion is conclusory, "basic principles of fairness require that he [or she] inform the claimant of his [or her] proposed action and give [the claimant] an opportunity to obtain a more detailed statement."  Hankerson v. Harris, 636 F.2d

24

893, 896 (2d Cir. 1980).

Furthermore, even when a treating physician's opinion is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also, Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(d)(2) (stating that the SSA "will always give *good reasons* in [its] notice of determination or decision for the weight [given to the claimant's] treating source's opinion") (emphasis added). Although the regulations do not explicitly or exhaustively define what constitutes a "good reason" for the weight given to a treating physician's opinion, the regulations provide the following enumerated factors that may guide an ALJ's determination: (1) the length, frequency, nature and extent of the treating relationship, (2) the supportability of the treating source opinion, (3) the consistency of the opinion with the rest of the record, (4) the specialization of the treating physician, and (5) any other relevant factors. See 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); Snell, 177 F.3d at 133.

## C. The ALJ's December 2008 Disability Determination

Applying the five-step sequential analysis for disability claims outlined above, the ALJ concluded at step one that plaintiff "has not engaged in substantial gainful activity

25

since January 25, 2008," the date of plaintiff's alleged disability onset date. (Tr. 10.) At step two, the ALJ determined that the plaintiff suffered from the severe medically determinable impairments of "cardiomyopathy, diastolic dysfunction, chronic atrial fibrillation, diabetes mellitus, and obesity." Id. However, the ALJ rejected the claimant's allegation of arthritis in his legs because there "was not sufficient medical documentation to find . . . a medically determinable impairment associated with arthritis of the legs." Id. At step three, the ALJ determined that the medical record failed to support a finding that plaintiff had an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1 of the regulations. Id.

Before continuing to steps four and five, the ALJ evaluated the entire record in order to determine the claimant's RFC. (Tr. 11.) In determining the claimant's RFC, the ALJ considered all the symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. Id. In considering the claimant's symptoms, the ALJ followed a two-step process whereby the ALJ first determined whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms, and second whether the intensity, persistence,

and limiting effects of the claimant's symptoms limit the
claimant's ability to do basic work activities.  Id.  Utilizing
this method, the ALJ held that "claimant's medically determinable
impairments could reasonably be expected to cause the alleged
symptoms; however, the claimant's statements concerning the
intensity, persistence and limiting effects of these symptoms
were not credible to the extent they are inconsistent" with the
RFC assessment in the record.  Id.

        In order to substantiate his determination, the ALJ
reviewed the relevant medical evidence in the record beginning
with the plaintiff's 2007 cardiac treatment records of Dr. Marian
David and Dr. Ramesh Gowda.  Id.  According to the ALJ, the
"cardiac treatment records from Dr. Marion [sic] show only mild
changes; and, an assessment by Dr. Gowda, a treating
cardiologist[,] related no apparent limitation."  (Tr. 12.)

        The ALJ next discussed the plaintiff's January 2008
treatment at Bronx Lebanon Hospital under the care of Dr.
Spinelli and discussed Dr. Spinelli's report on plaintiff's
condition during his visit.  Id.  According to the ALJ, plaintiff
reported  "dyspnea on exertion after two blocks on a level
surface . . . increasing lower extremity edema, . . . bilateral
knee osteoarthritis, . . . and increasing lower extremity edema"
to Dr. Spinelli.  Id.  The ALJ also discussed Dr. Spinelli's
discussion of plaintiff's "history of hypertension, heart

failure, diabetes, previous substance abuse, [and] atrial
fibrillation with persistent symptoms of shortness of breath,
orthopnea, and exertional chest pressure." Id.

The ALJ also took note of plaintiff's February 2008
echocardiogram and Dr. Spinelli's subsequent interpretation of
that echocardiogram. Id. The ALJ acknowledged the results of
the echocardiogram which showed "preserved ejection fraction" and
noted Dr. Spinelli's concern that plaintiff's symptoms "may be
related to ischemia since [plaintiff] gave a history of previous
catheterization which purportedly showed no significant coronary
disease." Id. The ALJ also discussed Dr. Spinelli's
recommendation that plaintiff undergo a nuclear stress test "to
rule out significant coronary disease given his persistent edema
despite normal ejection fraction and blood pressure control."
Id.

The ALJ then discussed and disposed of plaintiff's
disability claims arising from his diabetes and obesity
impairments. Id. Although the ALJ noted that "there [was] very
little documentation or recent treatment or complaints" regarding
plaintiff's diabetes, he concluded that the medical record
demonstrated that the diabetes was "non-insulin related and
controllable with diet and oral medication." Id. Furthermore,
the ALJ concluded that there were no indications that plaintiff's
obesity affected his ability to perform sedentary work. Id.

Finally, the ALJ discussed plaintiff's September 2008 pericardial window procedure which was performed to treat a large pericardial effusion. Id. Although the ALJ noted that Dr. Abadi's October 2008 wellness report indicated that the claimant was both temporarily unemployable and unemployable for at least twelve months, the ALJ declined to give significant weight to Dr. Abadi's opinion. Id.

To support his determination of conferring Dr. Abadi's opinion less than significant weight, the ALJ relied upon Dr. Gowda's prior assessments of plaintiff's functional status in November 2007, which were "consistent with the ability to perform significant work." Id. The ALJ also discussed the normal results of plaintiff's February 2008 echocardiogram. Id. Though noting that plaintiff's heart condition became "symptomatic later in 2008," the ALJ concluded that the "September 2008 surgery was meant to effectively treat this problem." Id. Finally, the ALJ concluded that given Dr. Abadi's "uncertain opinion, there is no basis to find that the claimant's pericardial effusion and necessary surgery will prevent the claimant from performing sedentary work for a period of at least [twelve] consecutive months." Id.

After reviewing the record, weighing the evidence, and declining to afford controlling weight to Dr. Abadi's opinion, the ALJ concluded that the plaintiff retained the RFC to sustain

sedentary type work for prolonged periods of time.  Id.

After determining plaintiff's RFC, the ALJ proceeded to
step four and concluded that the plaintiff was unable to perform
past relevant work, which is considered "light and semiskilled in
nature." (Tr. 13.)  However, at step five, the ALJ concluded
that in light of the plaintiff's "age, education, work
experience, and [RFC], there are jobs that exist in significant
numbers in the national economy that the claimant can perform."
Id.  Based upon Medical-Vocational Rule 201.21, a younger
individual of age eighteen to forty four, who is a high school
graduate with skilled or semi-skilled transferable skills and
retains the full range of sedentary work, is considered not
disabled under the regulations due to the individual's ability to
find a job in the national economy.  See 20 C.F.R. Pt. 404,
Subpt. P, App. 2, Rule 202.21.  Accordingly, the ALJ denied
plaintiff's SSI claim under the last step of the five-step
sequential analysis and affirmed the Commissioner's denial of
plaintiff's SSI application.  (Tr. 13.)

**D. Analysis**

The ALJ's denial of plaintiff's SSI disability claim
hinged primarily upon his determination that plaintiff could find
a job in the national economy.  (Tr. 13.)  To substantiate this
determination under step five of the five-step sequential SSI
analysis, the ALJ found that plaintiff retained the RFC to

perform the full range of sedentary work. (Tr. 12-13.) Because

of plaintiff's RFC, the ALJ also dismissed plaintiff's testimony

regarding his subjective complaints of pain. (Tr. 12.)

Therefore, the critical question upon review is whether or not

the ALJ appropriately evaluated plaintiff's RFC in light of the

evidence in the administrative record.

Liberally construed, plaintiff's complaint can be read

to give rise to two separate but interrelated arguments with

regard to the ALJ's disability determination. See Bertin v.

United States, 478 F.3d 489, 491 (2d Cir. 2007) (holding that

courts must liberally construe pleadings and briefs submitted by

pro se litigants and read such submissions to raise the strongest

arguments that they suggest). First, plaintiff's complaint

implicitly suggests that the ALJ committed legal error by failing

to fully and fairly develop the administrative record. (See Pl.

Compl.) Second, plaintiff's complaint explicitly challenges the

perfunctory dismissal of Dr Abadi's opinion regarding plaintiff's

functional capacity given his September 2008 pericardial

effusion. See id. In particular, plaintiff notes that the ALJ

"made a wrong decision base[d] on two doctors [that plaintiff]

visited one day apiece and gave [his] primary doctor['s] decision

[and] wellness report no consideration at all." Id. In effect,

plaintiff's brief but overt challenge of the ALJ's decisionmaking

process may be read to contest the ALJ's determination of the

weight given to Dr. Abadi's opinion when evaluating the medical evidence of record. See id.  For the reasons set forth below, the court holds that the ALJ here failed to discharge his affirmative burden to adequately develop the administrative record and also failed to appropriately determine the weight of Dr. Abadi's 2008 opinion in light of the medical evidence.

1. The ALJ Failed to Fully Develop the Administrative Record.

Even before reviewing the ALJ's disability determination under the substantial evidence standard, the court must first be satisfied that the ALJ provided plaintiff with "a full hearing under the Secretary's regulations" and also fully and completely developed the administrative record.  See Echevarria, 685 F.2d at 755 (citing Gold v. Sec'y of HEW, 463 F.2d 38, 43 (2d Cir. 1972)); Rodriguez v. Barnhart, No. 02-CV-5782(FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.")(citing Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999)).

Because of plaintiff's *pro se* status, the ALJ in this instance had a "heightened duty to scrupulously probe into, inquire of, and explore for all the relevant factors" when compiling the administrative record.  Cruz, 912 F.2d at 11 (citing Echevarria, 685 F.2d at 755).  This heightened duty is rooted in the ALJ's duty to "protect the rights of *pro se*

litigant[s] by ensuring that all of the relevant facts [are] sufficiently developed and considered." Hankerson, 636 F.2d at 895; see Cruz, 912 F.2d at 11.

Moreover, the ALJ's duty to develop the record includes advising the *pro se* plaintiff on the importance of evidence from his or her treating physician. See Batista v. Barnhart, 326 F. Supp. 2d 345, 352 (E.D.N.Y. 2004) (citing Jones v. Apfel, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999)). At a minimum, "before the ALJ can reject an opinion of a *pro se* claimant's treating physician because it is conclusory, basic principles of fairness require that he [or she] inform the [plaintiff] of his [or her] proposed action and give [plaintiff] an opportunity to obtain a more detailed statement." Hankerson, 636 F.2d at 896 (citing Dorman v. Harris, 633 F.2d 1035, 1040 (2d Cir. 1980)); see Batista, 326 F. Supp. 2d at 354 (citing 42 U.S.C.A. § 1382c). Here, the ALJ failed to develop a full and complete administrative record.

First, the ALJ failed to adequately develop the record regarding plaintiff's medical condition, RFC, and the extent, nature, and severity of plaintiff's impairments in 2007 by failing to obtain the medical opinion of plaintiff's primary care physician in 2007. In his complaint dated September 9, 2009, plaintiff alleges that Dr. Abadi had been his "primary care physician" for two years, which would extend back to September

2007. (Pl. Compl.) However, whether or not Dr. Abadi was indeed plaintiff's primary care physician in 2007, the court determines that the ALJ failed to request and evaluate the opinion of plaintiff's 2007 primary care physician at all.

This failure is compounded by the ALJ's heavy reliance upon the 2007 opinion of Dr. Ramesh Gowda in discounting Dr. Abadi's opinion and making his ultimate disability determination. (See Tr. 12.) Although Dr. Gowda noted that plaintiff did not "*seem* to have any [functional] limitations" (Tr. 123) (emphasis added), Dr. Gowda ultimately concluded that she would "defer to the primary care physician with regards to functional limitations." Id. This deferential statement should have prompted the ALJ either to direct plaintiff to obtain his primary care physician's 2007 opinion regarding his functional capacity and medical condition or to obtain such records *sua sponte*.[58] See Schaal, 134 F.3d at 505 ("[I]t was the ALJ's duty to seek additional information from [treating physician] *sua sponte*.").

In Cruz, the court concluded that the ALJ was required to make affirmative efforts, extending beyond simply sending a letter, to obtain a statement from plaintiff's treating physician

---

[58] Certainly, the court cannot predict whether or not plaintiff may produce such records nor can the court predict whether or not such records exist in the first place. However, the ALJ's oversight in making every effort to inquire upon or obtain such documents represents legal error. See Cruz, 912 F.2d at 11. Nowhere in the record or in the ALJ's decision is there any further mention of plaintiff's 2007 primary care physician. (See Tr. 123.)

to clarify and explain apparent gaps in the record. 912 F.2d at 11. The ALJ in the instant case failed to send even a letter to plaintiff's 2007 primary care physician much less inquire upon the identity of plaintiff's primary care physician in 2007. (Tr. 10-13.) Instead, the ALJ misconstrued Dr. Gowda's opinion as conclusive of plaintiff's RFC and employability and discounted evidence supportive of plaintiff's unemployability provided by Dr. Abadi in 2008. (Tr. 12-13.) Under Cruz, the ALJ's failure here to make any discernible effort to obtain the opinion or clarify the identity of plaintiff's 2007 primary care physician represents a clear failure to "scrupulously probe into, inquire of, and explore for all the relevant factors" concerning the *pro se* plaintiff's case. See 912 F.2d at 11. Accordingly, the ALJ failed to discharge his affirmative obligation to fully develop the record.

Second, the ALJ failed to seek clarification from Dr. Abadi concerning his 2008 wellness report. Instead of seeking clarification about Dr. Abadi's ambiguous medical opinion, the ALJ concluded that Dr. Abadi's opinion expressed "uncertain[ty]" with regard to plaintiff's functional capacity. (Tr. 12.) Because Dr. Abadi checked both the boxes for "temporarily unemployable" and "unable to work for at least [twelve] months" (Tr. 201), the ALJ characterized Dr. Abadi's opinion as "uncertain" and therefore found "no basis to find that the

claimant's pericardial effusion . . . will prevent the claimant from performing sedentary work for a period of at least [twelve] consecutive months." (Tr. 12.)

Certainly, the checking of both of these boxes created ambiguity in Dr. Abadi's 2008 opinion. This ambiguity was further compounded by Dr. Abadi's indication that plaintiff's condition has "been resolved or stabilized" but that he was also temporarily unemployable and unable to work for at least twelve months. (Tr. 201.) However, the ALJ lacked a sufficient basis to conclude that the apparent ambiguity of Dr. Abadi's opinion was tantamount to "uncertainty" without making a further inquiry into Dr. Abadi's reasoning for checking multiple boxes on plaintiff's functional capacity report. (Tr. 12.) It does not logically follow that because Dr. Abadi's opinion was ambiguous and slightly confusing that Dr. Abadi was uncertain about plaintiff's functional capacity; Dr. Abadi could have plausibly believed that plaintiff's "temporary" unemployability rendered him unemployable for "at least twelve months."[59] (Tr. 201.)

_____

[59]    Defendant argues that because Dr. Abadi checked both boxes, the ALJ concluded that "Dr. Abadi's statements were internally conflicting" and therefore had an adequate basis to reject his 2008 opinion. (Def. Mot. at 14.) Defendant's argument fails for two reasons. First, it is unclear that the ALJ totally rejected Dr. Abadi's opinion. (See Tr. 12.) Nowhere in his decision did the ALJ explicitly or unambiguously reject Dr. Abadi's opinion outright; rather, the ALJ simply refused to afford Dr. Abadi's opinion significant weight. Id. Second, the ALJ never referenced the internal inconsistency of Dr. Abadi's opinion as a reason to reject Dr. Abadi's opinion. See id. Rather, the ALJ simply suggested that Dr. Abadi's opinion was "uncertain." Id. Accordingly, defendant's argument cannot justify the ALJ's imprecise analysis of Dr. Abadi's opinion. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) (A reviewing court "may not accept

36

If an ALJ perceives possible ambiguities or
"inconsistencies in a treating physician's reports, the ALJ bears
an affirmative duty to seek out more information from the
treating physician and to develop the administrative record
accordingly."[60]  Hartnett, 21 F. Supp. 2d at 221 (E.D.N.Y. 1998)
(cited in Rosa, 168 F.3d at 79); see Rivera v. Barnhart, 379 F.
Supp. 2d 599, 604 (S.D.N.Y. 2005) ("The ALJ's obligation to fully
develop the record . . . requires that he or she seek additional
evidence or clarification when the report from the claimant's
medical source contains a conflict or ambiguity that must be
resolved.").

In Rosa, the ALJ failed to direct the *pro se* plaintiff
to ask her treating physician, Dr. Ergas, to supplement his
findings with additional information clarifying his medical

_____

appellate counsel's *post hoc* rationalizations for agency action.").

[60]    Some courts have held that the "duty to develop the record extends only
with respect to the 12-month period prior to the 'filing date of the
claimant's application for benefits'" and therefore does not require the ALJ
to develop the record subsequent to the claimant's application.  Brown v.
Comm'r of Soc. Sec., 2010 WL 1741121, at *2 (S.D.N.Y. 2010).  However, other
courts have held that the ALJ is responsible for developing a full and
complete record between the time that elapses between plaintiff's application
and plaintiff's hearing date.  See Pettey v. Astrue, 582 F. Supp. 2d 434
(W.D.N.Y. 2008) (holding that the ALJ's failure to develop the record between
2004 and 2006, the period that elapsed in plaintiff's application and hearing
date, constituted legal error justifying remand).  In this particular
circumstance, the court believes the more appropriate rule is the one adopted
in Pettey.  See id.  Given that the ALJ already had knowledge of plaintiff's
changed condition between the time of his application and time of his hearing,
the ALJ should have but did not seek further clarification from Dr. Abadi,
whose wellness report was already in the administrative record.  (See Tr. 200-
01.)  The rule in Pettey is partly supported by this Circuit's holding in Lisa
v. Sec'y of the Dep't of Health & Human Servs., 940 F.2d 40, 44 (2d Cir.
1991), wherein the court held that evidence from the period after the ALJ's
decision warranted remand because diagnoses post-dating the relevant period
could have revealed that plaintiff had "an impairment substantially more

opinion. 168 F.3d at 79. Specifically, the court held that plaintiff's treating physician, if asked, "'could have provided a sufficient explanation for any seeming lack of support for his ultimate diagnosis of complete disability.'" Id. (citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). The court in Rosa further noted that "a treating physician's 'failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case.'" Rosa, 168 F.3d at 79 (quoting Clark, 143 F.3d at 118).

As in Rosa, the ALJ here failed to direct plaintiff to ask Dr. Abadi for additional clarification of his 2008 wellness report. (See Tr. 10-13.) Instead, the ALJ implicitly dismissed Dr. Abadi's opinion as immaterial to the determination of disability on account of its "uncertain[ty]." (Tr. 12.) In fact, the wellness report form filled out by Dr. Abadi contained blank spaces where he could have explained his opinion regarding plaintiff's functional capacity and employability. (Tr. 200-01). The absence of Dr. Abadi's explanatory notes should have elicited the ALJ's attention. See Rosa, 168 F.3d at 79. By foregoing the opportunity to inquire further upon Dr. Abadi's 2008 wellness report to clarify the admittedly ambiguous opinion

---

severe than was previously diagnosed."

and by rejecting Dr. Abadi's opinion without fully developing the factual record, the ALJ committed legal error. See Rosa, 168 F.3d at 80.

Finally, the ALJ failed to advise the *pro se* plaintiff on the importance of clear and detailed evidence from his treating physician, Dr. Abadi, failed to inform plaintiff that his case was unpersuasive, and failed to request that the plaintiff supplement the record or call his treating physician as a witness at the hearing. (See Tr. 20-24.); see also Hankerson, 636 F.2d at 896; Batista, 326 F. Supp. 2d at 353.

In Hankerson, the Second Circuit held that "before the ALJ can reject an opinion of a pro se claimant's treating physician because it is conclusory, basic principles of fairness require that he inform the claimant of his proposed action and give him an opportunity to obtain a more detailed statement." 636 F.2d at 896. Furthermore, in Batista, the court held that "[i]t is incumbent upon the ALJ to obtain a report from the treating physician of a Social disability claimant, setting forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability." 326 F. Supp. 2d at 353 (citing Serrano v. Barnhart, No. 02 CIV.6372 (LAP)(AJP), 2003 WL 22683342, at *13 (S.D.N.Y. Nov. 14, 2003)); see Cruz, 912 F.2d at 11 (holding that the ALJ's failure to advise *pro se* claimant that she should obtain a more detailed

statement from constituted grounds for remand).

To that end, before denying plaintiff's SSI disability claim in this case, the ALJ in this case should have protected plaintiff's rights by at least informing plaintiff of the impending unfavorable determination in order to give plaintiff a chance to acquire a more detailed statement from Dr. Abadi regarding his opinion on plaintiff's functional capacity and the severity, nature, and extent of plaintiff's impairments. See Batista, 326 F. Supp. 2d at 353. Additionally, before refusing to afford Dr. Abadi's opinion significant weight on account of its "uncertain[ty]," the ALJ should have informed the claimant of his proposed action so that plaintiff could have attempted "to obtain a more detailed statement." Hankerson, 636 F.2d at 896.

Although defendant correctly notes that "the ALJ had the authority to weigh various medical opinions and choose between them" (Def.'s Mot. at 15) (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)), by no means does this excuse the ALJ from fully and fairly developing a complete administrative record. Where there are gaps in the administrative record, as there are here, courts are entitled to remand to the ALJ for further development of the evidence. See Rosa, 168 F.3d at 82-83 (citing Pratts, 94 F.3d at 39).

Accordingly, because the ALJ failed to obtain the 2007 medical opinion of plaintiff's primary care physician, failed to

40

clarify or even attempt to clarify Dr. Abadi's ambiguous wellness report of 2008, and failed to inform plaintiff of his imminent unfavorable disability determination and of the importance of his treating physician's opinion, the court remands this case to the ALJ with instructions to further develop the record by assisting plaintiff in acquiring the 2007 medical opinion of plaintiff's primary care physician during that time and by assisting plaintiff in acquiring clarifying statements from Dr. Abadi concerning Dr. Abadi's 2008 wellness report. See Rosa, 168 F.3d at 80.

## 2. The ALJ Erred in Failing to Give Good Reasons for the Weight Given to Dr. Abadi's Opinion

In determining plaintiff's RFC, the ALJ considered but refused to afford "significant weight" to the 2008 opinion of plaintiff's treating physician, Dr. Abadi, who had found that plaintiff was both temporarily unemployable and unemployable for at least twelve months. (Tr. 12, 201.)

Although the SSA considers opinions from treating physicians regarding the functional capacity, disability and employability of plaintiffs, the "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2); see 20 C.F.R. § 416.927(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); Snell, 177 F.3d at 133 ("A treating physician's statement that a

41

claimant is disabled is not determinative."). The Commissioner and ALJ give no "*special* significance to the source of an opinion on issues reserved to the Commissioner." See 20 C.F.R. § 416.927(e)(3) (emphasis added). Moreover, "where other substantial evidence in the record conflicts with the treating physician's opinion, . . . that opinion will not be deemed controlling" and the greater the conflict between that opinion and the record as a whole, the less weight afforded to the treating physician's opinion. See Snell, 177 F.3d at 133. Here, neither Dr. Abadi's 2008 opinion regarding plaintiff's functional capacity and employability nor Dr. Gowda's 2007 opinion regarding plaintiff's functional capacity should be afforded controlling weight under the statute, notwithstanding the deferential treating physician's rule. See 20 C.F.R. § 416.927(e)(3); see also, Snell, 177 F.3d at 133.

However, even if the ALJ properly declined to give Dr. Abadi's opinion "significant" weight, the ALJ must nonetheless adequately explain his reasons for not crediting Dr. Abadi's opinion and for the weight he did give to the opinion. See Schaal, 134 F.3d at 505; Regan v. Astrue, 2010 WL 1459194, at 12 (E.D.N.Y. Apr. 12, 2010). Indeed, the Second Circuit has held that although the SSA has the authority to decline giving controlling weight to a doctor's finding of disability, "it does not exempt administrative decisionmakers from their obligation,

42

under Schaal and § 404.1527(d)(2), to explain why a treating

physician's opinions are not being credited" and to explain the

weight given to such opinions.  Snell, 177 F.3d at 133

(referencing Schaal, 134 F.3d at 505).

In this regard, the regulations, referenced in Snell,

provide the ALJ with several enumerated factors to guide the

ALJ's determination of how much weight a treating physician's

opinion should receive if such an opinion does not receive

controlling weight.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d);

Snell, 177 F.3d at 133 ("Under the applicable regulations, the

Social Security Administration is required to explain the weight

it gives to the opinions of a treating physician.") (citing 20

C.F.R. § 404.1527(d)(2)).  For example, in assessing the

appropriate weight to afford to the opinion of Dr. Abadi, the ALJ

could have but failed to properly consider (1) the length,

frequency, nature and extent of the treating relationship, (2)

the supportability of the treating source opinion, (3) the

consistency of the opinion with the rest of the record, (4) the

specialization of the treating physician, and (5) any other

relevant factors.  See 20 C.F.R. §§ 404.1527(d)(2)-(6),

416.927(d)(2)-(6).[61]  Here, although the ALJ considered the

---

[61]     The regulations do not *explicitly* require the ALJ to consider these five
factors when determining the weight afforded to a treating physician's opinion
on disability or employability.  See 20 C.F.R. §§ 404.1527(d), 404.1527(e)
(explicitly requiring consideration of these factors only when evaluating a
treating source's medical opinion on issues not reserved to the Commissioner).
However, the Second Circuit in Snell made clear that the ALJ's obligation to

purported inconsistency of Dr. Abadi's opinion with the rest of the record, the ALJ failed to comprehensively set forth "good reasons" when deciding to give Dr. Abadi's 2008 opinion less than significant weight or to explain what weight he gave the opinion.

 (See Tr. 12.); see also, Snell, 177 F.3d at 133 (remanding social security disability appeal and noting that while plaintiff is "not entitled" to have treating physician's opinion afforded "controlling" weight, plaintiff "is entitled to be told why the Commissioner has decided – as under appropriate circumstances is his right – to disagree with" the treating physician).

        First, the ALJ did not consider the length, frequency, nature, and extent of the treating relationship of the different physicians in the record. (See Tr. 12.)  As plaintiff notes in his complaint, the ALJ appears to give more weight to Dr. Gowda and Dr. Spinelli, whom plaintiff allegedly visited "one day apiece," than to Dr. Abadi, plaintiff's primary care physician and treating cardiologist of "[two] years."  (See Pl. Compl.) When determining the persuasive authority of each of the physicians, the ALJ, in light of his duty to give adequate reasons for his determination, should have considered, discussed,

---

give adequate reasons for the weight afforded to treating physicians even on issues of disability and employability arises out of 20 C.F.R. § 404.1527(d)(2). See Snell 177 F.3d at 133.  Accordingly, the court considers each of the five factors articulated in 20 C.F.R. § 404.1527(d)(2) not as requirements but as a guide in evaluating whether or not the ALJ gave adequate reasons in determining the weight given to Dr. Abadi's 2008 opinion on plaintiff's disability.  See id.

and compared the details of the treatment relationships between each physician and the plaintiff.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also, Snell, 177 F.3d at 133.

Nor did the ALJ consider or explain the supportability of Dr. Abadi's dismissed opinion.  (See Tr. 12-13.)  As a part of his wellness report, Dr. Abadi diagnosed plaintiff with arthritis, hypertension, atrial fibrillation and pericardial effusion and also listed elevated blood pressure, irregular heartbeats, distant heart sounds, limitation of motion of joints, and edema of the lower legs as relevant clinical findings.  (Tr. 200.)  The ALJ failed to consider how these aforementioned diagnoses and findings supported Dr. Abadi's disability and unemployability finding when addressing the appropriate weight given to his opinion.  (See Tr. 12.)

Similarly, the ALJ did not consider the specializations of each of the treating physicians considered by the ALJ (Drs. Gowda, Spinelli, and Abadi).  (See Tr. 12.)  However, the record and the ALJ's opinions clarify that each of the physicians specialize in cardiology, suggesting that this factor may not have changed the ALJ's determination of the weight given to Dr. Abadi.  (See Tr. 12, 123, 200-01.)

Finally, the ALJ did not consider other potentially relevant factors that could have affected the determination of the weight given to Dr. Abadi's opinion.  (See Tr. 12.)  For

45

example, the ALJ could have but did not discuss Dr. Abadi's level "of understanding of [the SSA's] disability programs and their evidentiary requirements . . . and the extent to which [Dr. Abadi was] familiar with other information in [plaintiff's] case record." See 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6). Additionally, the ALJ could have but did not discuss the passage of time between the November 2007 opinion of Dr. Gowda and the October 2008 opinion of Dr. Abadi, which could have had some effect on the ALJ's determination of what weight to afford to both of the doctor's opinions given the change in plaintiff's medical condition due to the onset of his pericardial effusion in the summer of 2008. (See Tr. 12-13.)

Additionally, the ALJ's consideration and explanation of the purported inconsistency of Dr. Abadi's opinion with the rest of the evidence in the record was inadequate. In particular, the ALJ improperly discounted Dr. Abadi's opinion on the basis of and misconstrued the record with regard to: (i) the November 2007 opinion of plaintiff's short term treating cardiologist, Dr. Ramesh Gowda, (ii) the results of plaintiff's 2008 echocardiogram under the care of Dr. Spinelli, and (iii) plaintiff's successful September 2008 pericardial window procedure to discount Dr. Abadi's opinion. (See Tr. 10-13.)

*(i) Dr. Gowda's November 2007 Opinion*

First, although the ALJ suggested that Dr. Gowda's

November 2007 assessment of plaintiff's functional status was "consistent with the ability to perform significant work" (Tr. 12.), the ALJ failed to consider or make mention of Dr. Gowda's final conclusion with regard to plaintiff's functional capacity. (See Tr. 122-23.) Dr. Gowda, although opining that plaintiff's cardiac condition appeared to cause no functional limitations, ultimately noted that she would "defer to plaintiff's primary care physician," with regard to plaintiff's functional capacity designation. (See Tr. 123.) As discussed above, the unspecified primary care physician's opinion regarding plaintiff's functional capacity in 2007 is absent from the record. Notwithstanding this absence, the deference afforded by Dr. Gowda to plaintiff's unnamed primary care physician suggests that it is at least questionable that Dr. Abadi's 2008 opinion can be construed as totally inconsistent with Dr. Gowda's medical opinion.

The ALJ also failed to consider the timing of Dr. Gowda's 2007 opinion relative to the later opinion of Dr. Abadi, which was made in 2008. (Tr. 12.) Dr. Gowda's opinion, given in November 2007, was prior to plaintiff's alleged disability onset date of January 25, 2008 and prior to plaintiff's pericardial effusion of September 2008. (See Tr. 122, 198.) This temporal disjuncture could explain the difference in opinions between Dr. Gowda in 2007 and Dr. Abadi in 2008 and calls into question the ALJ's suggestion that Dr. Abadi's opinion is inconsistent with

Dr. Gowda's opinion. (Tr. 12.) However, as mentioned above, this time difference was not considered by the ALJ in his decision. (See Tr. 12-13.)

Yet, by discounting Dr. Abadi's opinion, which accounts for plaintiff's more recent condition after his pericardial effusion in 2008, on the grounds that Dr. Abadi's opinion is inconsistent with Dr. Gowda's 2007 opinion, the ALJ failed to make his determination on the basis of all available evidence as required, including evidence about the "current condition of a disability claimant." See 42 U.S.C.A. § 1382c(a).

*(ii) Plaintiff's 2008 Echocardiogram Results*

Second, the ALJ incorrectly suggested that Dr. Abadi's opinion was inconsistent with plaintiff's 2008 echocardiogram results. Id. Although the ALJ correctly noted that the echocardiogram demonstrated a normal ejection fraction of 67%, the ALJ failed to sufficiently discuss Dr. Spinelli's follow up consultation subsequent to the echocardiogram when determining the inconsistency of Dr. Abadi's opinion with the record. (See Tr. 12, 156, 178.) During that consultation, Dr. Spinelli noted plaintiff's persistent, albeit lessened, complaints of shortness of breath, fatigue, and some orthopnea. (Tr. 178.) Dr. Spinelli, in addition to expressing a concern that plaintiff's symptoms were related to ischemia, also noted that plaintiff showed an asymptomatic moderate sized pericardial effusion. (Tr.

48

156.)  Because of plaintiff's persistent symptoms, Dr. Spinelli

recommended a nuclear stress test to "rule out significant

coronary disease."  (Tr. 156-57.)

Thus, although the ALJ briefly mentioned the

purportedly normal results of plaintiff's echocardiogram when

declining to afford significant weight to Dr. Abadi's opinion,[62]

the ALJ failed to consider Dr. Spinelli's post-procedure

consultation regarding the echocardiogram in which the doctor

expressed continuing concern about significant coronary disease

and noted persistent symptoms possibly related to heart

disease.[63]  (See Tr. 12, 156-57.)  In fact, Dr. Spinelli's

recommendation of a nuclear stress test to rule out "significant"

heart disease is not inconsistent with Dr. Abadi's opinion that

plaintiff is both temporarily unemployable and unemployable for

at least twelve months.  (See Tr. 200-01.)  By failing to

accurately consider Dr. Spinelli's interpretation of the

echocardiogram and instead interpreting a normal ejection

fraction of 67% as inconsistent with Dr. Abadi's opinion of

plaintiff's disability, the ALJ inappropriately substituted "his

---

[62]    Admittedly, the ALJ did discuss Dr. Spinelli's findings in his
disability determination; however, the ALJ did not mention Dr. Spinelli's
interpretation of plaintiff's 2008 echocardiogram when articulating his
reasons for declining to give Dr. Abadi's opinion significant weight on
account of its inconsistency with the record.  (See Tr. 12.)

[63]    Defendant argues that the findings of Dr. Spinelli "contradicted Dr.
Abadi's opinion that plaintiff was disabled."  (Def.'s Mot. at 14.)  However,
Dr. Spinelli's findings cannot reasonably be construed as entirely
contradictory to Dr. Abadi's October 2008 opinion given Dr. Spinelli's concern
over plaintiff's continuing heart problems.  (See Tr. 12.)

own judgment for competent medical opinion." See Green-Younger,
335 F.3d at 106 (quoting Rosa, 168 F.3d at 78-79).

*(iii) Plaintiff's 2008 Pericardial Window Procedure*

        Third, the ALJ noted that although plaintiff's
pericardial effusion became symptomatic later in 2008,
plaintiff's 2008 surgery was "meant to effectively treat this
problem." (Tr. 12.) Although the ALJ here correctly noted the
intention of the pericardial window procedure (i.e., what the
procedure was "meant" to treat), the ALJ failed to sufficiently
discuss whether that intention was completely achieved. (Tr. 12-
13.) Moreover, the intention of plaintiff's pericardial window
surgery does not necessarily render Dr. Abadi's finding on
plaintiff's employability inconsistent with the rest of the
evidence in the record. For example, plaintiff could very well
have demonstrated severe and prohibitive cardiac limitations
notwithstanding a successful pericardial window procedure.

        Taken together, the ALJ's failure to accurately
consider the totality of the record and to adequately consider
the aforementioned guiding factors when determining the weight
given to Dr. Abadi's opinion illustrates the ALJ's failure to
"comprehensively set forth his [good] reasons for the weight
assigned to [Dr. Abadi's] opinion." See Halloran, 362 F.3d at 33.

   Accordingly, this case must be remanded to the ALJ. See Snell,
177 F.3d at 133 (citing Schaal, 134 F.3d at 505) ("Failure to

provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."); Pratts, 94 F.3d at 39.

### III.    CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion; specifically, the ALJ should:

(1) Direct and assist the plaintiff in obtaining the 2007 medical opinion of plaintiff's primary care physician to which Dr. Gowda's opinion defers;

(2) Request an explanation and clarification from Dr. Abadi concerning his ambiguous 2008 opinion regarding plaintiff's RFC, employability, and disability status;

(3) Inform the plaintiff of the importance of his treating physicians' opinions regarding plaintiff's impairments and assist the plaintiff in acquiring their complete and detailed opinions in order to fully develop the administrative record;

(4) Provide a clear and explicit statement of what affirmative weight, if any, was given to Dr. Abadi's 2008 opinion; and

(5) Provide a clear and explicit statement of the "good reasons" for the weight given to Dr. Abadi's opinion in

light of the court's foregoing discussion. Given the passage of time between the ALJ's initial determination and the instant disposition, the court also recommends that the ALJ:

(6) Inquire upon plaintiff's current medical condition as it relates to plaintiff's initial SSI application. See <u>Lisa</u>, 940 F.3d at 44 (holding that plaintiff's medical condition after the ALJ's initial disability determination may reveal that a claimant "had an impairment substantially more severe than was previously diagnosed"); and

(7) Reassess plaintiff's testimonial credibility, subjective complaints of pain and functional limitations, employability, and disability in light of this opinion, in light of plaintiff's current medical condition, and in light of any newly obtained information relevant to plaintiff's claims. See <u>id.</u>

**So Ordered.**

Dated:     Brooklyn, New York
           July 9, 2010

                                    _____/s/_____
                                    **Kiyo A. Matsumoto**
                                    United States District Judge
                                    Eastern District of New York